Case No. 25-3020

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

## LEONARD MOORE, *et al.*,
Defendant-Appellants

v.

## ANTHONY JEFFERSON, *et al.*,
Plaintiff-Appellee

---

## MEMORANDUM BRIEF OF DEFENDANT-APPELLANTS
## LEONARD MOORE, *et al.*

---

Appeal from the United States District Court for the District of Kansas
Case No. 23-CV-3263-TC-TJJ
Honorable Toby Crouse, United States District Judge

---

OFFICE OF KANSAS ATTORNEY
GENERAL KRIS KOBACH
Matthew L. Shoger, Assistant A.G.
120 SW 10th Ave, 2d Floor
Topeka, Kansas 66612
785-296-2215
matt.shoger@ag.ks.gov

ORAL ARGUMENT IS NOT REQUESTED

# PRIOR OR RELATED APPEALS

None.

# GLOSSARY

Motion...........Appellants' Motion for Judgment on the Pleadings

or, in the Alternative, for Summary Judgment

# JURISDICTIONAL STATEMENT

The U.S. District Court for the District of Kansas had jurisdiction over this case because the Plaintiff, Anthony Jefferson, asserted claims under 42 U.S.C. § 1983. This appeal arises from the district court's January 24, 2025, order denying without prejudice Defendant-Appellants Leonard Moore, Austin Merz, Bryan Buchman, Trenton Burk, Orlando Perez, and Clay Cooper's ("Appellants") Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment ("Motion"). (Addendum A.) As further explained in this brief, this Court has jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine to hear Appellants' appeal. Appellants seek for the Court to reverse and remand the case to the district court for immediate consideration of Appellants' Motion.

Further, as Appellants' opening brief will argue in greater detail, the supposed procedural grounds for denial cited in the district court's order are contrary to law and constitute error and an abuse of discretion. They do not give rise to any valid independent reason to deny Appellants' Motion.

# STATEMENT OF THE ISSUES

**I.  The district court's order postponed or failed to rule on Appellants' immunity arguments, making the order immediately appealable under the collateral order doctrine.**

# STATEMENT OF THE CASE

On January 14, 2025, Appellants filed a Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment ("Motion") that raised the defenses of Eleventh-Amendment immunity and qualified immunity for all of the Appellants. (Addendum C.) On January 25, 2025, the district court denied the Motion without prejudice and stated two reasons for doing so: (1) the court claimed Appellants' Motion exceeded the page limit for motions *not* in support of summary judgment, and (2) the court claimed motions in support of summary judgment like Appellants' Motion are "premature" before discovery. (Addendum A.) Appellants filed a timely Notice of Interlocutory Appeal on February 5, 2025. Appellants seek for the Court to reverse and remand the case to the district court for immediate consideration of Appellants' Motion.

On March 27, 2025, this Court, through the clerk, ordered the Appellants to further explain the jurisdictional basis of this appeal. Appellants now file this brief in response to the Court's order.

## SUMMARY OF ARGUMENT

The district court implicitly denied Appellants the protections of immunity from discovery by postponing or failing to rule on their pre-discovery immunity arguments. That makes the district court's order immediately appealable under the collateral order doctrine. Further, as Appellants' opening brief will argue in greater detail, the supposed procedural reasons for the denial provided by the district court are error and an abuse of discretion and do not provide independent grounds for denying the Motion. Accordingly, this Court has jurisdiction, and Appellants respectfully ask this Court to proceed to the briefing stage of this appeal.

## ARGUMENT

### I. The district court's order postponed or failed to rule on Appellants' pre-discovery immunity arguments, making the order immediately appealable under the collateral order doctrine.

#### *Standard of Review*

Whether the Court has interlocutory jurisdiction under the collateral-order doctrine is a legal question that the Court determines in the first instance. *United States v. Tucker*, 745 F.3d 1054, 1062 (10th Cir. 2014).

#### *Discussion*

An interlocutory appeal under the collateral order doctrine is considered to be an appeal from a "final decision" under 28 U.S.C. § 1291 even though it is not an appeal from a "final judgment." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-47 (1949); *Heard v. Dulayev*, 29 F.4th 1195, 1200-01 (10th Cir. 2022) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). "[T]he Court has recognized that a question of immunity is separate from the merits of the underlying action for purposes of the *Cohen* test even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." *Mitchell*, 472 U.S. at 528-29. Accordingly, "[a] district

court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Heard*, 29 F.4th at 1200-01 (quoting *Mitchell*, 472 U.S. at 530).

Supreme Court cases such as *Mitchell* "make clear" qualified immunity "is meant to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (citing *Mitchell*, 472 U.S. at 526). And "this right is important enough to support an immediate appeal." *Id. Mitchell* "unmistakably envisioned immediate appeal of the denial of a defendant's motion for dismissal or summary judgment on the ground of qualified immunity." *Id.*

Even with regard to factual issues, qualified immunity can be raised pre-discovery in "a motion for summary judgment" or "a motion to dismiss or in the alternative for summary judgment." *See Siegert v. Gilley*, 500 U.S. 226, 229-235 (1991). In *Siegert*, the defendant had filed "a motion to dismiss or in the alternative for summary judgment," and "the District Court issued an order "[declining] to decide this matter on

a Summary Judgment motion at this time" because "the court determined that "[it] would like to see a more developed record." *Id.* at 229 (alterations in original). The district court attempted to order additional discovery, but the defendant appealed under the collateral order doctrine "pursuant to *Mitchell*." *Id.* at 230. The Supreme Court stated plainly that qualified immunity can be "asserted in a motion for summary judgment" and that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Id.* at 231; *see also Stonecipher v. Valles*, 759 F.3d 1134, 1148-49 (10th Cir. 2014) (holding that "qualified immunity protects against the burdens of discovery" while ruling on a summary-judgment motion). The Supreme Court, on an interlocutory appeal, relied on evidence presented on the pre-discovery summary-judgment arguments to determine that the plaintiff had not overcome the defense of qualified immunity as asserted by the defendant and so affirmed the court of appeals in ordering the district court to dismiss the suit. *Siegert*, 500 U.S. at 231-35.

Similarly, in *Dyer v. Rabon*, the defendants filed "motions for summary judgment asserting qualified immunity." 212 F. App'x 714, 716 (10th Cir. 2006). But the district court struck those motions, "to be

reurged consistent with the scheduling order" at a later stage of the case. *Id.* The defendants appealed, arguing the refusal to address their respective qualified-immunity motions was immediately appealable. *Id.* The Tenth Circuit agreed and ruled that "a district court's postponement of or failure to rule on a qualified immunity defense is immediately appealable" in order to protect officials "not only from liability, but also 'from the ordinary burdens of litigation, including far-ranging discovery.'" *Id.* (quoting *Workman v. Jordan*, 958 F.2d 332, 335 (10th Cir. 1992)). But the Court recognized that "this court should not determine whether qualified immunity exists where the district court has not yet passed upon the issue." *Id.* So the Tenth Circuit reversed and remanded "to the district court for immediate consideration of the Appellants' respective qualified immunity challenges." *Id.*

***Here, Appellants seek for the Court do the exact same as in Dyer. Appellants seek for the Court to reverse and remand to the district court for immediate consideration of Appellants' immunity-based challenges.***

To deny the ability of government officers to raise qualified immunity arguments through summary judgment prior to discovery

without at least "issu[ing] a discovery order narrowly tailored to uncover only those facts needed to rule on the immunity claim," *Thomas v. Kaven*, 765 F.3d 1183, 1197 n.9 (10th Cir. 2014), is to deny them the protections of qualified immunity. *Id.*; *Dyer*, 212 F. App'x at 716 (10th Cir. 2006) (citing *Workman*, 958 F.2d at 336 (10th Cir. 1992)) (saying *Workman* noted "the appropriate discovery limitations that district courts impose when qualified immunity motions are outstanding"); *see also United States v. Pickard*, 676 F.3d 1214, 1217 (10th Cir. 2012) (saying postponing a decision on qualified immunity is immediately appealable because "defendants lose the right to be free from the burdens of pretrial discovery and trial"). In other words, to decline to rule on qualified immunity arguments until after discovery concludes is to withhold the protections of qualified immunity from discovery. It is therefore the equivalent of denying qualified immunity for purposes of the collateral order doctrine. (That said, as in *Dyer*, the scope of the appeal will be narrower, calling only for a reversal and remand to the district court to determine the issue in the first instance, when "the district court has not yet passed upon the issue" of qualified immunity. 212 F. App'x at 716.)

The *Johnson v. Jones*, 515 U.S. 304 (1995) case raised *sua sponte* by the clerk is not to the contrary. *Johnson* held, in the context of a summary-judgment motion *after* discovery, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." 515 U.S. at 319-20. First, *Johnson* did not involve claims of immunity from discovery. And *Johnson* did not overrule prior cases like *Behrens*, *Mitchell*, and *Siegert* that clearly held qualified immunity protects defendants from discovery and can support an immediate appeal when that protection is denied. Even if this Court ultimately finds the reasoning of *Johnson* may implicitly overrule cases like *Behrens*, *Mitchell*, and *Siegert*, this Court is nevertheless required to follow the holdings of those cases. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *see also Mallory v. Norfolk S. Ry. Co.*,

600 U.S. 122, 136 (2023) (quoting *Rodriguez*, 490 U.S. at 484) (same). Cases where discovery has not even started have not reached a stage where *Johnson*'s post-discovery limit on immunity would apply.

Second, the district court's order in this case made no finding of a genuine issue of fact for trial, so *Johnson*'s straightforward holding does not apply. Quite differently from *Johnson*, the district judge here made clear in his order that he believes qualified immunity should not be available in a summary-judgment motion prior to the completion of discovery, so he refused to rule on Appellants' qualified-immunity arguments at all. (Addendum A.) For both reasons, *Johnson* does not apply here.

Similarly to *Siegert* and *Dyer*, Appellants raised qualified immunity in their pre-discovery Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment. The facts in Appellants' motion provide context for the qualified immunity inquiry. "[T]he clearly-established-law analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Jones v. Manriquez*, 811 F. App'x 482, 489 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Accordingly, Appellants' repeatedly

referenced qualified immunity arguments while discussing the specific factual context. (Addendum C at 4, 23-33, 35-36.) To deny Appellants' the ability to raise qualified-immunity arguments through summary judgment and force them to go through the full burdens of pre-trial discovery is to deny them qualified immunity by postponing it, which is immediately appealable to this Court.

The same analysis applies to Eleventh Amendment immunity, a denial of which is also immediately appealable under the collateral order doctrine and for the same reasons. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145, 147 (1993). Jefferson sued Appellants in their official capacities seeking monetary relief, so Eleventh Amendment immunity applies. (Addendum C at 19.) Eleventh-Amendment immunity is also a jurisdictional bar. *Edelman v. Jordan*, 415 U.S. 651, 678 (1974). Despite this, the district court postponed ruling on Appellants' Eleventh-Amendment immunity arguments by declining to rule on Appellants' properly presented motion. (*See* Addendum A.) And, under the same rationale as for qualified immunity, *postponing* ruling on Eleventh-Amendment

immunity arguments is to deny that immunity, making the decision immediately appealable under the collateral order doctrine.

Additionally, as Appellants' opening brief will argue in greater detail, the supposed procedural reasons for the denial provided by the district court are error and an abuse of discretion and do not provide independent grounds for denying the Motion.

## CONCLUSION

For these reasons, the Court has jurisdiction over this appeal. Appellants therefore respectfully ask this Court to proceed to the briefing stage of this appeal.

Respectfully submitted,

Kris W. Kobach
Attorney General of Kansas

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
785-296-2215
Fax: (785) 291-3767
*Attorney for the Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of 10th Cir. R. 27.3(B)(3) because it contains 2,104 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), as calculated by the word-counting function of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface – 14-point Century Schoolbook – using Microsoft Word.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing BRIEF OF DEFENDANT-APPELLANTS, as submitted in digital form via the

court's ECF system, is an exact copy of the written document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April, 2025, the foregoing BRIEF OF DEFENDANT-APPELLANTS was electronically filed with the Clerk of the Tenth Circuit Court of Appeals by using the CM/ECF system. I further certify that I cause one paper copy to be deposited in the United States Mail, first-class postage prepaid, addressed to:

Anthony Jefferson #44578
Lansing Correctional Facility
P.O. Box 2
Lansing, KS 66043
*Plaintiff, pro se*

DATED: April 10, 2025          */s/ Matthew L. Shoger*
                              Matthew L. Shoger
                              Assistant Attorney General

# ATTACHMENTS

## 10th Cir. R. 28.2(A) Attachments

Addendum A..........District Court Order (Doc. 64)

## Fed. R. App. P. 28(f) Attachments

Addendum B..........28 U.S.C. § 1291

## Other Attachments

Addendum C..........Motion for Judgment on the Pleadings or, in the

Alternative, for Summary Judgment (Doc. 59)

**Addendum A**

## In the United States District Court
## for the District of Kansas

_____

Case No. 23-cv-3263-TC-TJJ

_____

ANTHONY JEFFERSON,

*Plaintiff*

v.

LEONARD MOORE, ET AL.,

*Defendant*

_____

## ORDER

Plaintiff Anthony Jefferson filed this pro se civil rights action under 42 U.S.C. § 1983. Doc. 1. The Complaint names as defendants several persons in their individual and official capacities. *Id.* at 1–4. On January 14, 2023, Defendants Leonard Moore, Austin Merz, Bryan Buchman, Trenton Burk, Orlando Perez, and Clay Cooper filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) requesting that Plaintiff's claims be dismissed for lack of subject-matter jurisdiction and for failure to state a claim or, in the alternative, for summary judgment under Rule 56. Doc. 59. Two reasons justify denying Defendants' motion without prejudice.

First, there is tension between the substance of the pleading and its invocation of Rule 56. Defendants have styled their motion as one for judgment on the pleadings under Rule 12 and seek dismissal for lack of subject-matter jurisdiction and for failure to state a claim. *See* Doc. 59 at 1 ("Defendants . . . respectfully request . . . that the Court dismiss the claims against them under Fed. R. Civ. P. 12(c) for lack of subject-matter jurisdiction and failure to state a claim."). But the length of the pleading far exceeds that permitted for Rule 12 motions. *See* D. Kan. Rule 7.1(d).

Second, a motion for summary judgment is premature. In the ordinary course, a defendant would file and litigate a single Rule 12

1

motion and then, after discovery closed, file a single Rule 56 motion that relies on the facts discovered. To be sure, Rule 56 permits filing a summary judgment motion "at any time until 30 days after" discovery has closed. Fed. R. Civ. P. 56(b). But early motions are frequently denied because the case has not yet developed, no discovery has occurred, and the parties' claims and defenses have not been formalized by way of a pretrial order. *See generally* Fed. R. Civ. P. 56(b), Advisory Committee Notes (2010) (recognizing that "in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had," because scheduling orders and other pretrial orders "can regulate timing" to fit the needs of the case); *see also McCoy v. Aramark*, Case No. 21-3269, Docs. 63 & 75 (denying similar motions). And multiple summary judgment motions filed throughout the course of the litigation are generally disfavored. *See, e.g.*, *Power Equip. Co. v. Turner Bros. Constr., Inc.*, No. 21-0153, 2022 WL 5166631, at *2 (D.N.M. Aug. 30, 2022) (citing several cases, including from the District of Kansas). Thus, even without the aforementioned issue, Defendants' motion for summary judgment would be denied without prejudice because it is premature.

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings or, in the alternative, Motion for Summary Judgment, Doc. 59, is DENIED without prejudice. They may file an answer or other response on or before February 7, 2025.

It is so ordered.

Date: January 24, 2025                    _s/ Toby Crouse_____
                                         Toby Crouse
                                         United States District Judge

2

Addendum B

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1291

§ 1291. Final decisions of district courts

Currentness

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 97-164, Title I, § 124, Apr. 2, 1982, 96 Stat. 36.)

28 U.S.C.A. § 1291, 28 USCA § 1291
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

End of Document     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Addendum C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

ANTHONY JEFFERSON,                         )
                                           )
      Plaintiff,                    )
                                           )
v.                                         )     Case No. 23-3263-TC-GEB
                                           )
LEONARD MOORE, *et al.*,                   )
                                           )
      Defendants.                   )
_____)

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Defendants Leonard Moore, Austin Merz, Bryan Buchman, Trenton Burk, Orlando

Perez, and Clay Cooper ("Defendants") respectfully request, through Assistant Attorney General

Matthew L. Shoger, that the Court dismiss the claims against them under Fed. R. Civ. P. 12(c)

for lack of subject-matter jurisdiction and failure to state a claim, or alternatively that the Court

grant summary judgment in their favor pursuant to Fed. R. Civ. P. 56.

Defendants raise the defenses of Eleventh Amendment immunity and qualified immunity,

which bar pre-trial discovery, including when raised in a summary-judgment motion.

*Stonecipher v. Valles*, 759 F.3d 1134, 1148-49 (10th Cir. 2014) (holding that "qualified

immunity protects against the burdens of discovery" while ruling on a summary-judgment

motion); *Jones v. Kansas*, No. 12-2486-KHV-DJW, 2012 WL 5362905, at *2 (D. Kan. Oct. 31,

2012) (citing *Liverman v. Comm. on the Judiciary*, 51 F. App'x 825, 827-28 (10th Cir. 2002))

("Eleventh Amendment immunity . . . is a bar to discovery."). Ruling on the immunity issues

should not be postponed. *Dyer v. Rabon*, 212 F. App'x 714, 716 (10th Cir. 2006) (citing

*Workman v. Jordan*, 958 F.2d 332, 336 (10th Cir. 1992)); *United States v. Pickard*, 676 F.3d

1214, 1217 (10th Cir. 2012).

Defendants attach three new exhibits, outlined in the table below, and state the following in support.

### INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | KASPER Information Sheet |
| B | Declaration of Kate Hussey |
| C | Declaration of Bryan Buchman |

### NATURE OF THE CASE

Plaintiff Anthony Jefferson, currently incarcerated at Lansing Correctional Facility (LCF) (Doc. 38; Exhibit A at 2-3), alleges that on July 26, 2023, while incarcerated at the El Dorado Correctional Facility (EDCF), he experienced a medical issue with his lower back and began to seize up. (Doc. 1 at 2; Doc. 24 at 2; Doc. 25 at 2.[1]) A medical code was called. (Doc. 24 at 2; Doc. 25 at 2.) Plaintiff says he fell to the ground with continued seizures, was handcuffed behind his back, and was placed in a restraint chair. (Doc. 24 at 2; Doc. 25 at 2.)

Defendants Buchman and Merz responded to place restraints on Plaintiff while Perez recorded with a camera. (Doc. 24 at 2; Doc. 25 at 2.) Plaintiff admits that his behavior was abnormal and could be looked at as non-compliant due to his allegedly involuntary movements. (Doc. 24 at 7; Doc. 25 at 6-7.) Plaintiff further states he was screaming and foaming at the mouth, which he says was due to his alleged medical condition. (Doc. 24 at 7.) Plaintiff alleges that Defendant Merz applied a hypoglossal-nerve pressure-point technique to get him to comply and that while that occurred Plaintiff spat up blood. (Doc. 24 at 3, 7-8; Doc. 25 at 3, 7.) Plaintiff alleges that Defendant Buchman "grabbed [him] in [his] throat while laying on the floor" and "choked" him. (Doc. 1 at 3-4.) Plaintiff alleges that Defendants Burk and Cooper were holding

---

[1] The Court's earlier screening order treated factual allegations made in Docs. 24 and 25 as part of the pleadings (Doc. 27 at 3-5), so this Motion does as well.

his legs and that Defendant Buchman kneed him in his thigh and hip area. (Doc. 1 at 3-4; Doc. 24 at 3, 8, 17-18, 22; Doc. 25 at 3, 7, 13.) Plaintiff states that Defendant Merz applied the hypoglossal-nerve pressure point once more while in the trauma room. (Doc. 24 at 3, 8, 17; Doc. 25 at 3, 7, 14.) Further, Plaintiff alleges that he informed staff that his handcuffs were too tight, and he also alleges that his hands were numb. (Doc. 24 at 4, 12, 19; Doc. 25 at 4, 10.) This allegedly caused scarring. (Doc. 24 at 18-19; Doc. 25 at 10, 12.) Plaintiff complains that Defendant Moore failed to grant his administrative personal-injury claim regarding the incident. (Doc. 1 at 2, 6, 8.)

Jefferson filed this lawsuit on December 28, 2023. (Doc. 1.) He brings three counts. (Doc. 1 at 6-7.) Count I alleges "cruel and unusual punishment" under the Eighth Amendment and a violation of equal protection under the Fourteenth Amendment for denial of an administrative personal-injury claim. (Doc. 1 at 6.) Counts II and III allege "deliberate indifference" under the Eighth Amendment related to staff using "excessive force." (Doc. 1 at 6-7.) Jefferson seeks compensatory damages in the amount of $100,000. (Doc. 1 at 8.) Defendant Centurion filed its Motion to Dismiss on October 11, 2024. (Docs. 46-47.) Defendants Finch and Thatcher initially filed their Motion to Dismiss on October 24, 2024, and they filed an amended memorandum in support on October 29, 2024, with leave of the Court. (Docs. 50-54.) Defendants filed an Answer on November 8, 2024. (Doc. 56.) Defendants now file their Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment.

The evidence shows that Merz only used the hypoglossal-nerve pressure point at two points: while Jefferson was resisting until Jefferson was fully secured in the mobile restraint chair and for a short time after Jefferson spat on another officer in the trauma room. (Exhibit C at ¶¶ 8-9, 22-24; Doc. 12; Exhibit B at ¶¶ 31-34; Doc. 8-12 at ¶¶ 6, 8-9, Doc. 8-11, Doc. 8 at 8

(explaining Exhibit N); Doc. 8-13 (Exhibit N).) At no point during the encounter with Jefferson on July 26, 2023, did Buchman choke Jefferson or otherwise restrain Jefferson's head, neck, or throat. (Exhibit C at ¶ 33; Doc. 12.) Buchman's knee carefully struck the femoral pressure point in response to Jefferson resisting to assist the responding officers in securing Jefferson in the mobile restraint chair. (Exhibit C at ¶¶ 6-7, 10-12, 15-17, 19, pg. 6; Doc. 12.) None of the Defendants applied the handcuffs to Jefferson. (*See* Doc. 12; Exhibit B.) And the handcuffs caused only minimal abrasions and scratches. (Doc. 8-14 at 18-42; Doc. 12.)

Jefferson's official-capacity claims against the Defendants should be dismissed for lack of subject-matter jurisdiction due to Eleventh-Amendment immunity. Jefferson's individual capacity claims should be dismissed for failure to state claim in light of qualified immunity because there is no constitutional right to a prison grievance procedure, hearsay statements by Finch and Thatcher are inadmissible against Defendants, Defendants Merz and Buchanan did not use excessive force, Defendants were not deliberately indifferent to any serious medical needs related to the handcuffs, and Defendants did not fail to intervene when no constitutional violation was present to intervene in. Alternatively, the Defendants should be granted summary judgment in light of the uncontested evidence in the case and in light of qualified immunity.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1. Anthony Jefferson (#44578) is an inmate who was housed at El Dorado Correctional Facility on July 26, 2023. (Exhibit A at 2-3; Doc. 26 at ¶ 1.)

2. In the sealed surveillance camera video ("Video 1") of the incident contained in Exhibit V to the *Martinez* Report (Doc. 12), at 5:30:14, Jefferson came out of his cell at EDCF on July 26, 2023, into the dayroom. (Exhibit B at ¶¶ 8, 15; Doc. 12; *see also* Exhibit A at 3; Doc. 26 at ¶ 1.)

3.  In Video 1 at 5:30:17, Jefferson fell on the floor in the dayroom. (Exhibit B at ¶ 16; Doc. 12.)

4.  Defendant Finch made an officer-needs-assistance call due to a medical emergency, and other officers responded to the call. (Doc. 24 at 2; Doc. 25 at 2; Doc. 26 at ¶ 2; Doc. 8-12 at ¶¶ 5-6; Doc. 8-11; Exhibit C at ¶ 4; *see also* Doc. 12; Exhibit B at ¶¶ 10-14.)

5.  After the code was called, the restraint chair was requested. (Exhibit C at ¶ 5.)

6.  In Video 1, from 5:31:52 to 5:32:14, Jefferson rolled around on the floor. (Doc. 12.)

7.  In Video 1, from 5:32:14 to 5:32:34, Jefferson kicked his legs around. (Doc. 12.)

8.  In Video 1, from 5:32:34 to 5:32:46, Jefferson rolled around on the floor again and kicked his legs. (Doc. 12.)

9.  In Video 1, at 5:32:46, Jefferson got up and tried to move away from the officers near him. (Doc. 12.)

10. In Video 1, at 5:32:55, the first officers responding to the call arrived. They grabbed Jefferson, but Jefferson leaned away and fell to the ground at 5:33:00. (Doc. 12; Exhibit B at ¶¶ 18-20, 22-24.)

11. At that point, officers restrained Jefferson on the ground and placed handcuffs on him. (Doc. 12.)

12. None of the defendants in this case placed handcuffs on Jefferson. (Doc. 12; Exhibit B; *see also* Doc. 24 at 2; Doc. 25 at 2.)

13. After being handcuffed, Jefferson continued to move around on the ground and kick his legs (which resulted in him moving several yards across the floor). (Doc. 12.)

14. While this occurred, officers placed leg restraints on Jefferson. (Doc. 12; *see also* Doc. 24 at 2; Doc. 25 at 2.)

15. Pictures from later that day and from the days immediately after show only minimal abrasions and scratches around the wrist area where the handcuffs were placed. (Doc. 8-14 at 18-42.)

### *Defendant Merz*

16. In Video 1, at 5:35:22, Merz arrived and brought the mobile restraint chair to the scene. (Exhibit B at ¶¶ 31-34; Doc. 8-12 at ¶¶ 5-6; Doc. 8-11; Doc. 12.)

17. When defendant Austin Merz arrived, Jefferson had already been placed in wrist and leg restraints. (Doc. 8-12 at ¶ 5; *see also* Doc. 12; Exhibit B at ¶¶ 31-34.)

18. It was unclear to Merz whether Jefferson was suffering from a medical issue or if he was in an altered state due to drug use. (Doc. 8-12 at ¶ 6; *see also* Doc. 24 at 7; Doc. 25 at 7.)

19. Merz assisted in restraining Jefferson and placing him in the restraint chair. (Doc. 8-12 at ¶ 6; Doc. 12.)

20. Jefferson was awake and screaming continuously while he was being placed in the restraint chair. (Exhibit B at ¶ 7; Doc. 12; *see also* Doc. 24 at 7.).)

21. In the sealed handheld camera video ("Video 2") of the incident contained in Exhibit V to the *Martinez* Report (Doc. 12), at no point did anyone ask Jefferson if he was high. (*See* Doc. 12; *see also* Exhibit B at ¶ 8.)

22. In Video 2, from 00:00 until Jefferson was fully strapped into the restraint chair at 02:02, Jefferson exclaimed, unprompted, "I'm not high!" at least 9 times. (Doc. 12.)

23. That equates to Jefferson screaming "I'm not high!" about once every 14 seconds. (122 seconds divided by 9 times = about 14 seconds per time.)

24. Jefferson also yelled other things during this time. (Doc. 12.)

25. Throughout Video 2, Jefferson looked around with a wide-eyed expression, often at places where no one was standing. (Doc. 12.)

26. In Video 2, from 00:00 to at least 09:00, despite being vocal, Jefferson did not respond to the substance of any questions or commands directed at him in such a manner that a reasonable person could interpret it as engaging in dialogue. (Doc. 12.)

27. Officers gave Jefferson clear commands to stop resisting. For example, Merz gave Jefferson a command to stop resisting in Video 2 at 00:20. (Doc. 12.)

28. Jefferson actively struggled with officers who were attempting to secure him into the restraint chair. (Doc. 8-12 at ¶ 8; Exhibit C at ¶ 7; Doc. 12.)

29. In Video 2, at 00:10, Jefferson lifted his waist out of the chair. (Doc. 12; Exhibit B at ¶ 17.)

30. In Video 2, at 00:12, Merz pushed Jefferson's left leg down and then used his left knee to hold Jefferson's left leg down, but Jefferson immediately leaned his torso forward, away from the chair. (Doc. 12.)

31. In Video 2, at 00:16, Merz pushed Jefferson's upper torso back into the chair, and another officer started to use his knee to hold Jefferson's right leg down. (Doc. 12.)

32. In Video 2, at 00:18, Merz removed his knee from Jefferson's left leg and began using the hypoglossal-nerve pressure-point technique to the under-jaw area of Jefferson's neck. (Doc. 8-12 at ¶¶ 6, 8-9; Doc. 8-11 ("I then maintained control of offender Jeffersons [sic] head"); Exhibit C at ¶ 8; Doc. 12; *see also* Doc. 25 at 7; Doc. 26 at ¶ 5.)

33. Merz had been trained to use this pressure-point technique. (Doc. 8-12 at ¶ 8; Doc. 8 at 8 (describing Exhibit N); Doc. 8-13 (Exhibit N).)

34. The hypoglossal nerve is located approximately one-inch forward of the angle on the mandible and that one inch under the jaw is the most sensitive location of the nerve, where it enters the posterior part of the tongue. Merz was trained to apply pressure

toward the top and center of the skull with the thumb supported by the first, or by using

the two middle fingers unsupported. Merz was trained to use the hypoglossal nerve

pressure point as a distraction tool, for pain compliance, or for balance displacement.

(Doc. 8-12 at ¶ 8; Doc. 8 at 8 (describing Exhibit N); Doc. 8-13 (Exhibit N).)

35. Merz used this pressure-point technique in an attempt to gain control of Jefferson. (Doc.

8-12 at ¶ 8; Exhibit C at ¶ 8; *see also* Doc. 12.)

36. Merz did not apply pressure to Jefferson's throat. (Doc. 8-12 at ¶ 9; Doc. 12.)

37. Despite Merz's use of the hypoglossal-nerve pressure-point technique, Jefferson was

continuing to struggle against the officers attempting to place him in the restraint chair.

(Exhibit C at ¶ 9; Doc. 12.)

38. Drugs or alcohol can alter a subject's resistance level and pain threshold in the subject's

response to pressure-point techniques. (Exhibit C at ¶¶ 12-13, pg. 6.)

39. In Video 2, at 00:18, despite the other officer continuing to use a knee to hold Jefferson's

right leg down, Jefferson lifted his waist out of the chair, which lifted the other officer's

knee. (Doc. 12.)

40. In Video 2, at 00:32, Jefferson's waist finally returned to the chair with two officers

pushing it down. (Doc. 12.)

41. In Video 2, at 00:59, Merz removed his right hand from performing the hypoglossal-

nerve pressure-point technique and adjusted his sunglasses, and Jefferson immediately

leaned his torso forward, away from the restraint chair. (Doc. 12.)

42. In Video 2, at 00:60, Merz returned his right hand to performing the hypoglossal-nerve

pressure-point technique, and he pulled Jefferson's torso back into the restraint chair.

(Doc. 12.)

43. In Video 2, at 01:11, Merz removed his right hand from the hypoglossal-nerve pressure-point technique to help with placing straps for the restraint chair. (Doc. 12.)

44. In Video 2, at 01:14, Jefferson leaned his torso forward, away from the restraint chair for 3 seconds. (Doc. 12.)

45. In Video 2, at 01:23, Merz returned his right hand to performing the hypoglossal-nerve pressure-point technique. (Doc. 12.)

46. In Video 2, at 01:28, Merz again removed his right hand from the hypoglossal-nerve pressure-point technique to help with placing straps for the restraint chair. (Doc. 12.)

47. In Video 2, at 01:30, Jefferson leaned his torso forward, away from the restraint chair. (Doc. 12.)

48. In Video 2, at 01:37, Merz returned his right hand to the hypoglossal-nerve pressure-point technique. (Doc. 12.)

49. In Video 2, at about 02:02, when Jefferson was fully strapped into the restraint chair, Merz removed both hands from performing the hypoglossal-nerve pressure-point technique. (Doc. 12.)

50. In Video 2, from 00:18 to 02:02, while Merz uses the hypoglossal-nerve pressure-point technique, the video shows Jefferson foaming at the mouth with minimal blood mixed in. (Doc. 12.)

51. Jefferson says the foaming at the mouth was due to a medical condition. (Doc. 24 at 7.)

52. In Video 2, from 02:02 to 08:43, Merz did not touch Jefferson. (Doc. 12.)

53. In Video 2, at about 02:02, Merz grabbed the restraint chair's handles, tipped the chair back onto its wheels, and turned the chair to face medical personnel before tipping the chair back to level and flat at 02:12. (Doc. 12.)

54. In Video 2, at about 02:12, a member of the medical staff attempted to get Jefferson's attention, but rather than acknowledge this, Jefferson simply exclaimed, "I'm not struggling! I'm not high!" (Doc. 12.)

55. In Video 2, at 02:19, Merz tipped the chair back onto its wheels and began wheeling Jefferson out of the room and to the trauma room. (Doc. 8-11; Doc. 8-12 at ¶ 6; Doc. 12.)

56. Jefferson was awake and screaming for the duration of his transport to the trauma room. (Doc. 8-12 at ¶ 7; Doc. 12.)

57. In Video 2, from 02:19 until Jefferson was placed in the trauma room at 05:56, Jefferson exclaimed, unprompted, "I'm not high!" at least 14 times. (Doc. 12.)

58. Jefferson flailed his legs and head during the trip to the trauma room. (Doc. 12.)

59. In Video 2, at 05:56, Merz let the chair sit flat in the trauma room, then tipped it back and moved it forward before letting it sit flat again at 06:09. (Doc. 12.)

60. Jefferson flailed his legs and head while in the trauma room. (Doc. 12.)

61. In Video 2, from 05:56 until Jefferson was wheeled out of the trauma room at 16:02, Jefferson exclaimed, unprompted, "I'm not high!" at least 21 times. (Doc. 12.)

62. In Video 2, at 08:42, Jefferson spat on a correctional officer. (Doc. 12; Exhibit C at ¶¶ 20-22.)

63. An inmate spitting on a correctional officer is not only considered physical assault that can lead to a disciplinary report or even criminal charges, but it also constitutes a serious breach of security and order within the prison, is disrespectful to the officer's authority, and can potentially transmit diseases. (Exhibit C at ¶ 23.)

64. In Video 2, at 08:43, immediately after Jefferson spat on an officer, Merz used the hypoglossal-nerve pressure point again to gain control of Jefferson. (Doc. 12; Exhibit C

at ¶ 24; *see also* Doc. 24 at 3, 8, 17; Doc. 25 at 3, 7, 14; Doc. 26 at ¶ 7.)

65. In Video 2, at 08:58, Merz stopped performing the hypoglossal-nerve pressure-point technique. (Doc. 12.)

66. In Video 2, from 08:58 to 15:26, Merz did not touch Jefferson. (Doc. 12.)

67.  In Video 2, at 15:26, Merz and another officer checked Jefferson's pockets. (Doc. 12.)

68. In Video 2, at 16:02, the chair was wheeled out of the trauma room to an infirmary cell where Merz assisted in unstrapping Jefferson from the restraint chair and in strip searching Jefferson. (Exhibit C at ¶¶ 25-27; Doc. 12.)

69. Merz did not touch Jefferson's throat area during the strip search. (Doc. 12.)

70. In Video 2, from 16:02 until the end of Video 2, Jefferson exclaimed, unprompted, "I'm not high!" at least 13 times. (Doc. 12.)

71. In total in Video 2 (which is 21 minutes and 51 seconds in length), Jefferson exclaimed, unprompted, "I'm not high!" at least 57 times. (Doc. 12.)

72. At the end of Video 2, Merz left the infirmary cell, the door to the cell was closed and locked, Merz helped remove Jefferson's wrist restraints using the food pass door, and the food pass door was secured. (Doc. 12; Exhibit C at ¶¶ 28-32.)

73. Merz never choked Jefferson. (Doc. 8-12 at ¶¶ 7, 9; Doc. 12.)

74. Jefferson never became semi-unconscious during Merz's interactions with him that day. (Doc. 8-12 at ¶ 7; Doc. 12; *see also* Doc. 13 at 7.)

75. Merz subjectively believed the force he used was reasonable and necessary to perform his job duties and to safely transport Jefferson. (Doc. 8-12 at ¶ 10.)

76. Defendant Bryan Buchman observed Merz's uses of the hypoglossal nerve pressure point. (Exhibit C at ¶¶ 8, 24; *see also* Doc. 12.)

77. Buchman had also been trained to use this pressure-point technique. (Exhibit C at ¶¶ 8, 11; *see also* Doc. 8 at 8 (describing Exhibit N); Doc. 8-13 (Exhibit N).)

78. Based on officer Buchman's training and experience, the use of pain-compliance techniques is considered a low level of force. (Exhibit C at ¶¶ 12, 14, pg. 6.)

79. Buchman subjectively believed that the force Merz used was reasonable and necessary in the circumstances to gain control of Jefferson and to safely transport him, and it was in line with officer Merz's job duties. (Exhibit C at ¶¶ 8, 24.)

### *Defendant Buchman*

80. In Video 1, at 5:36:49, Defendant Bryan Buchman appeared on the scene in the dayroom. (Exhibit B at ¶¶ 46-58; Doc. 12.)

81. Buchman was not present when Jefferson was on the ground in the dayroom. (Doc. 12.)

82. Upon Buchman's arrival, he observed that other officers had Jefferson sitting in the restraint chair and the officers were attempting to get him fully secured. (Exhibit C at ¶ 6; *see also* Doc. 12.)

83. Buchman observed, despite several officers attempting to hold Jefferson down, that Jefferson was managing to lift himself from the chair and was yelling hysterically. He was actively struggling against officers who were attempting to place him into the restraint chair. (Exhibit C at ¶ 7; *see also* Doc. 12.)

84. In Video 2, at 00:40, Buchman began talking with the officers on the scene. (Doc. 12.)

85. In Video 2, at 00:46, Buchman began moving into position to strike Jefferson's leg with his knee as part of the peroneal-nerve pressure-point technique. (Doc. 12; *see also* Exhibit C at ¶ 15.)

86. The femoral nerve pressure point is located on the inside of the thigh approximately six inches above the knee. Striking the femoral nerve pressure point results in temporary

immobilization and motor dysfunction of the affected leg, along with mental stunning due in part to high-intensity pain. Based on Buchman's training and experience, it is common to use a knee to strike the femoral nerve pressure point for this technique. Buchman was trained to use this technique to assist in takedown control and distraction, enabling further restraint. (Exhibit C at ¶¶ 10-12, pg. 6.)

87. In Video 2, from 00:51 to 00:55, Buchman used his knee to execute six quick strikes to Jefferson's left peroneal-nerve pressure point. (Exhibit C at ¶ 15; Doc. 12.)

88. Buchman had been trained to use this pressure-point technique. (Exhibit C at ¶¶ 10-12, pg. 6.)

89. Buchman used the technique "to assist the other officers in controlling and restraining Jefferson, who was still actively struggling." (Exhibit C at ¶ 15; *see also* Doc. 12.)

90. These strikes resulted in temporary immobilization, motor dysfunction, and mental stunning, as intended. This caused Jefferson's muscles to briefly relax and for his struggling to briefly pause, which is noticeable in Video 2. (Exhibit C at ¶ 16; Doc. 12.)

91. The brief pause in Jefferson's struggling enabled officers to finish strapping Jefferson into the restraint chair more easily. (Exhibit C at ¶ 17; Doc. 12.)

92. After Jefferson was fastened into the restraint chair, Buchman and other SST officers escorted Jefferson out of the cellhouse to the trauma room. (Exhibit C at ¶ 20; Doc. 12.)

93. Buchman and other officers escorted Jefferson to the infirmary cell where Buchman assisted Merz in unstrapping Jefferson from the restraint chair and in strip searching Jefferson. (Exhibit C at ¶¶ 25-27; Doc. 12.)

94. At the end of Video 2, Buchman left the infirmary cell, the door to the cell was closed, Buchman locked the cell door, Jefferson's wrist restraints were removed using the food

pass, and Buchman secured the food pass. (Doc. 12; Exhibit C at ¶¶ 28-32.)

95. At no point during the encounter with Jefferson on July 26, 2023, did Buchman choke

   Jefferson or otherwise restrain Jefferson's head, neck, or throat. (Exhibit C at ¶ 33; Doc.

   12.)

96. The closest Buchman got to touching Jefferson's head, neck, or throat during the incident

   on July 26, 2023, was when Buchman used scissors to cut the back of Jefferson's shirt so

   a strip search could be conducted. (*See* Exhibit C at ¶ 27; Doc. 12.)

97. Buchman subjectively believed the force he used was reasonable and necessary to gain

   control of Jefferson and to safely transport him, and it was in line with his job duties.

   (Exhibit C at ¶ 19.)

### *Defendant Perez*

98. With a handheld camera, defendant Orlando Perez recorded the officers placing Jefferson

   into a restraint chair, and he continued recording the incident until Jefferson was removed

   from the restraint chair, strip searched, and secured in an infirmary cell. (Doc. 12; Exhibit

   B at ¶¶ 35-39.)

99. At 5:36:11 in the surveillance camera video ("Video 1"), the handheld camera video

   ("Video 2") starts with its own clock set to 00:00. (Exhibit B at ¶¶ 8, 38; *see also* Doc.

   12.)

100. Video 1 ends at 5:38:37, but Video 2 continues on past that point (that is, past 02:26).

    (Doc. 12; *see also* Exhibit B at ¶ 38.)

### *Defendant Burk*

101. Defendant Trenton Burk assisted in restraining Jefferson and placing him in the restraint

    chair. (Doc. 12; Exhibit B at ¶¶ 18-21; *see also* Doc. 25 at 3; Doc. 26 at ¶ 6.)

102. In Video 2, at 01:38, Burk went out of the camera's field of view. Burk does not appear

in Video 2 after that point. (Doc. 12.)

103. Burk does not appear in Video 2 after 01:38, so he does not appear during any parts of Video 2 that occurred in the trauma room. This is because Burk did not accompany Jefferson to the trauma room. (Doc. 12.)

### *Defendant Cooper*

104. Defendant Clay Cooper assisted in restraining Jefferson and placing him in the restraint chair. (Doc. 12; Exhibit B at ¶¶ 40-45; *see also* Doc. 25 at 3; Doc. 26 at ¶ 6.)

105. Cooper does not appear in Video 2 after at 02:22, so he does not appear during any parts of Video 2 that occurred in the trauma room. This is because Cooper did not accompany Jefferson to the trauma room. (Doc. 12.)

### *Defendant Finch*

106. Defendant Christopher Finch was present when Jefferson fell to the floor in the dayroom. (Doc. 12; Exhibit B at ¶¶ 10-14.)

107. Finch radioed in the incident. (Doc. 24 at 2; Doc. 25 at 2; *see also* Doc. 12; Exhibit B at ¶¶ 10-14.)

108. Finch did not assist in placing Jefferson in the restraint chair. (Doc. 12; Exhibit B at ¶¶ 10-14.)

109. While officers were restraining Jefferson in the restraint chair, Finch turned or walked away from the restraint chair several times. (Doc. 12; Exhibit B at ¶¶ 10-14.)

110. In Video 2, from 00:15 to 00:27, Finch tied his shoe. (Doc. 12; Exhibit B at ¶¶ 10-14.)

111. For the majority of the time that Jefferson was being placed in the restraint chair, Finch was not watching defendant Merz. (Doc. 12; Exhibit B at ¶¶ 10-14.)

112. In Video 1, at 5:38:28, after grabbing Jefferson's shoe (which had come off), Finch turned and walked back toward Jefferson's cell. He did not walk toward the trauma room

with the group escorting Jefferson. (Doc. 12; Exhibit B at ¶¶ 10-14.)

113. Finch does not appear in Video 2 after 1:51, so he does not appear during any parts of

Video 2 that occurred in the trauma room. This is because Finch did not accompany

Jefferson to the trauma room. (Doc. 12; Exhibit B at ¶¶ 10-14.)

### *Defendant Thatcher*

114. Defendant Sarah Thatcher assisted in restraining Jefferson and securing him in the

restraint chair. (Doc. 12; Exhibit B at ¶¶ 22-30.)

115. While officers were restraining Jefferson in the restraint chair, Thatcher turned or walked

away from the restraint chair several times. (Doc. 12; Exhibit B at ¶¶ 22-30.)

116. In Video 1, at 5:38:26, Thatcher walks off screen to the right. She did not walk toward

the trauma room with the group escorting Jefferson. Thatcher does not appear in Video 1

after that point. (Doc. 12; Exhibit B at ¶¶ 22-30.)

117. Thatcher does not appear in Video 2 after 1:50, so she does not appear during any parts of

Video 2 that occurred in the trauma room. This is because Thatcher did not accompany

Jefferson to the trauma room. (Doc. 12; Exhibit B at ¶¶ 22-30.)

### *Defendant Moore*

118. Defendant Leonard Moore was not present at the incident on July 26, 2023, and he does

not appear in either Video 1 or Video 2. (Exhibit B at ¶ 59; *see also* Doc. 12.)

## ARGUMENTS AND AUTHORITES

### *Standard on Motion for Judgment on the Pleadings*

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) for

lack of subject-matter jurisdiction and failure to state a claim is subject to the same standards as a

motion to dismiss under Rule 12(b)(1) and 12(b)(6). 5C Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 1367 (3d ed., Feb. 2024 update); *see also Brokers' Choice of*

*Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1101-02 (10th Cir. 2017).

### Standard on Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims for lack of subject-matter jurisdiction. Jefferson, as the party invoking the Court's jurisdiction, bears the burden of showing its existence. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018).

### Standard on Motion to Dismiss for Failure to State a Claim

On a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pleaded factual allegations in the complaint, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), but a complaint must also contain enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Although courts have traditionally construed *pro se* pleadings in a liberal fashion, this "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Similarly, courts do not assume the role of an advocate for the *pro se* litigant by constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). And a *pro se* litigant is expected to adhere to the same rules of procedure that govern any other litigant in this circuit. *Id.*

### Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *McCoy v. Meyers*, 887 F.3d 1034,

1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *Id.* "[W]hile courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). Facts must be shown through affidavits, deposition transcripts, or incorporated exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. [citation omitted] To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021).

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity "is meant to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such *pretrial* matters as discovery, as inquiries of this kind can be peculiarly disruptive of effective government." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (emphasis in original).

When a defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.* "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th

Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The clearly-established right must be clear from applicable case law, *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019), and must be defined with specificity, *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019).

**I.**    **The Eleventh Amendment bars Jefferson's § 1983 claims against KDOC officials in their official capacities for monetary damages.**

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). State officials such as KDOC employees share the state's immunity from suits against them in their official capacities. *See id.*; *White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996). A narrow exception allows a plaintiff to seek prospective relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)). But claims for "retrospective declaratory relief" are barred. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, Jefferson requests monetary relief in the form of compensatory damages (Doc. 1 at 8) which is barred by the Eleventh Amendment as asserted against the Defendants in their official capacities as corrections officers. Jefferson does not request prospective relief. Therefore, Jefferson's claims against the Defendants in their official capacities should be dismissed for lack of subject matter jurisdiction due to Eleventh-Amendment immunity.

**II.    Plaintiff fails to state a plausible claim against Defendant Moore because there is no constitutional right to state administrative grievance procedures.**

A prison's administrative grievance procedure must be followed by an inmate to exhaust administrative remedies under the Prison Litigation Reform Act. *Jones v. Bock*, 549 U.S. 199, 218 (2007). For KDOC inmates, personal-injury claims are a type of administrative grievance that is used to exhaust administrative remedies for claims of personal injury. *Brown v. Schnurr*, No. 22-3183, 2023 WL 5163987, at *1 to *5 (10th Cir. Aug. 11, 2023). But "there is no independent constitutional right to state administrative grievance procedures." *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011). So failing to grant an administrative grievance does not violate the U.S. Constitution. *Id.* Here, Jefferson alleges in Count I that Defendant Moore dismissed his personal-injury claim on October 25, 2024, supposedly in violation of his Eighth and Fourteenth Amendment rights. (Doc. 1 at 6.) But there is no constitutional right to an administrative grievance procedure. So Count I fails to state a claim for which relief may be granted.

**III.   Finch's and Thatcher's statements regarding the incident do not support Jefferson's claims against Defendants.**

Under a motion-to-dismiss standard, the Court accepts as true well-pleaded facts alleged in the Complaint, but does not accept as true implausible, conclusory, or speculative allegations. *See Soto ex rel. Estate of Jimenez v. Bd. of Cnty. Comm'rs*, 748 F. App'x 790, 793 (10th Cir. 2018) (citing Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.

20

Jefferson attaches to his complaint the following statement from defendant Finch:

> On 7-26-23 during a [sic] emergency while putting resident Jefferson in the mobile restraint chair SST used the pressure point underneath the jaw line pulling upward to gain compliance. Jefferson was not spitting or trying to do anything at the time he was strapped in and as far as I could see he was compliant. . . . During the use of the pressure point there was blood appearing to come from the resident's mouth.

(Doc. 1-1 at 10.) Jefferson also attaches to his complaint the following statement from defendant Thatcher:

> On 7-26-23 during this medical emergency with Resident Jefferson, I witnessed SST Merz apply his fingers in jeffersons [sic] throat underneath his jaw to the point where blood was coming from his mouth. He was in restraint chair and restrained at this point.

(Doc. 1-1 at 11.)

First, as an initial matter, even if Jefferson's interpretations of these statements as saying he was not struggling (*see* Doc. 24 at 9, 17-18) were correct, Finch's and Thatcher's alleged words are hearsay, at least as applied to defendants other than themselves. *See Lilly v. Virginia*, 527 U.S. 116, 128 (1999) (plurality opinion) (saying the Supreme Court has "consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against . . . interest did not justify its use as evidence against another person"), *abrogated on other grounds as recognized by United States v. Smalls*, 605 F.3d 765, 772-75 (10th Cir. 2010) (saying *Lilly* had allowed statements to survive the U.S. Constitution's Confrontation Clause when a statement "falls within a firmly rooted hearsay exception" but later Supreme Court decisions separated Confrontation Clause jurisprudence from hearsay law); Fed. R. Evid. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay: . . . The statement is offered against *an* opposing party and . . . was made by *the* party in an individual or representative capacity" (emphasis added)); Fed. R. Evid. 801(d)(2)(E) advisory committee's

note to 1972 proposed rules (stating that even for the hearsay exclusion for admissions by co-conspirators, "The rule is consistent with the position of the Supreme Court in denying admissibility to statements made after the objectives of the conspiracy have either failed or been achieved.").

Second, neither Finch's nor Thatcher's statements say that Jefferson was compliant at the time the pressure point was used. Finch's statement said the pressure point was applied "to gain compliance" and while still "putting resident Jefferson in the mobile restraint chair." Then, only after "he was strapped in" to the mobile restraint chair does Finch's statement say "Jefferson was not spitting or trying to do anything" and "as far I could see he was compliant." And Finch's statement does not say the pressure point was applied after Jefferson was strapped in. So his statement does not say that Jefferson was compliant while the pressure point was being applied or that the pressure point was applied while Jefferson was fully restrained in the mobile restraint chair. With regard to Thatcher's statement, her statement says that the pressure point was applied while Jefferson was restrained in the restraint chair, but it never says Jefferson was compliant at any point. So neither statement says Jefferson was compliant at the time the pressure point was used.

Alternatively, if the Court reaches this issue on summary judgment, the evidence further shows that these statements were made by individuals who were not present in the trauma room when Merz used the hypoglossal-nerve pressure-point technique on Jefferson in the trauma room. (Defendants' Statement of Facts (DSOF) ¶¶ 112-13, 116-17).

Therefore, Finch's and Thatcher's statements regarding the incident do not support Jefferson's claims against Defendants.

IV.     **In light of qualified immunity, Defendant Merz and Buchman did not use excessive force when the force was used in response to Jefferson resisting and was de minimis.**

The Eighth Amendment protects inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. The primary concern of the drafters was to outlaw torture and other barbarous methods of punishment. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). To prevail on his Eighth Amendment excessive force claim, Jefferson must allege and prove both an objective and a subjective element. *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *4 (10th Cir. Aug. 19, 2022) (citing *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)).

   1. *Objective Element*

First, to establish the objective component, Jefferson must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. "[N]ot every allegedly malevolent touch by a prison guard gives rise to a federal cause of action. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 37-38.

While the presence of an injury is not required, the presence or absence of an injury is a factor in the determination of whether a prison official's conduct constituted an objectively serious use of force. *See Northington v. Jackson,* 973 F.2d 1518, 1523 (10th Cir. 1992). Conclusory claims of severe pain are insufficient to establish an objectively serious use of force. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (A pro se litigant's "conclusory

23

allegations without supporting factual averments are insufficient to state a claim on which relief can be based."); *Lane v. Carty*, No. 09-3153-SAC, 2009 WL 3125469, at *3 (D. Kan. Sept. 28, 2009) (finding no Eighth Amendment violation because the plaintiff's allegations of injury and pain were "completely conclusory").

### 2. *Subjective Element*

Second, to establish the subjective component, Jefferson must show that the Defendants "acted with a sufficiently culpable state of mind." *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *4 (10th Cir. Aug. 19, 2022) (citing *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)). The inmate must show both that the guard intended to harm the prisoner and that the guard used more force than appeared reasonably necessary at the time to maintain or restore institutional order. *Scott v. Clune*, No. 17-3024-JAR, 2018 WL 3222612, at *3 (D. Kan. July 2, 2018) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 495 (10th Cir. 1983)).

Regarding intent to harm, the conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley*, 475 U.S. at 319. Rather, Jefferson must show that the Defendants took their actions "maliciously and sadistically for the very purpose of causing harm" and not in a "good faith effort to maintain or restore discipline." *Id.* at 320-21; *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (saying this standard applies regardless of "[w]hether the prison disturbance is a riot or a lesser disruption"). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319.

Regarding reasonableness of force, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight." *Kisela v. Hughes*, 584 U.S. 100, 103 (2018). The analysis must consider "the highly-charged prison environment and accord wide-ranging deference to prison officials." *McCoy v. Kan. Dep't of Corr.*, No. 16-3239-SAC, 2018 WL 1726344, at *4 (D. Kan. Apr. 10, 2018) (citing *Hudson*, 503 U.S. at 6, and *Sampley*, 704 F.2d at 495-96). In such an environment, disobeying orders constitutes grounds for the use of force. *Delaney v. Zmuda*, No. 19-3221-SAC, 2021 WL 843237, at *2 (D. Kan. Mar. 5, 2021) ("Failure to comply with an order is grounds for the use of force in the Tenth Circuit."); *Redmond v. Crowther*, 882 F.3d 927, 938 (10th Cir. 2018) ("[P]risoners cannot be permitted to decide which orders they will obey, and when they will obey them."). Tinges of violence from a prisoner can constitute grounds for the use of force, as well, when such actions are "clearly contrary to the legitimate penological interest of maintaining control and discipline of the prison facility"; "under such circumstances, the use of some physical force such as pepper spray can hardly be considered repugnant to the conscience of mankind." *Evans v. Schnurr*, No. 18-3193-JWB, 2020 WL 1547818, at *8 (D. Kan. Apr. 1, 2020) (when inmate was refusing to comply and threatening violence); *Evans v. Cawthorn*, No. 16-3095-DDC, 2019 WL 5787952, at *7 to *8 (D. Kan. Nov. 6, 2019) (when inmate was resisting restraint applied for a medical assessment); *Grissom v. Roberts*, No. 09-3128-SAC, 2009 WL 2601260, at *6 (D. Kan. Aug. 24, 2009) (when inmate was refusing restraint and had thrown a cup of water on an officer).

Courts may consider: (1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) any threat reasonably perceived by the officers; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of injury inflicted. *Hudson*, 503 U.S. at 7.

3.  *Application*

a.  Hypoglossal-Nerve Pressure Point

Jefferson alleges that Defendant Merz "is one of the SST officers who responded to my medical condition and also one who choked me until I became semi unconscious and started spitting up blood." (Doc. 1 at 2; *see also id.* at 4.) Jefferson concedes that the tactic used by Defendant Merz was for "pressure compliance" *Id.* Jefferson further acknowledges that his behavior was abnormal and could understandably be looked at as non-compliant due to allegedly involuntary movements. (Doc. 24 at 7; Doc. 25 at 6-7.)

Courts have found that the use of a pressure point by an officer is not objectively unreasonable when an inmate is resisting and any injuries inflicted are de minimis. *See Johnson v. Rouse*, 2012 WL 1849664, at *2 (D. Or. Apr. 4, 2012) (finding that an officer's use of a pressure point was reasonable "to defend himself and subdue an out of control, aggressive inmate, and did not violate plaintiff's constitutional rights"); *see also Heiderscheid v. Dakota Cnty. Sheriff's Off.*, 2020 WL 5128147, at *15 (D. Minn. July 22, 2020) (finding the use of pressure points objectively reasonable to control a pretrial detainee's head while attempting to secure him in a restraint chair), *report and recommendation adopted*, 2020 WL 5106816, at *1 (D. Minn. Aug. 31, 2020), *aff'd*, 848 F. App'x 678, 678 (8th Cir. 2021).

Based on Jefferson's own admissions of non-compliant behavior, it follows that there would be a need for a correction officer, such as Defendant Merz, to use a trained pressure point tactic to gain obedience. The use of the hypoglossal-nerve pressure-point technique was a de minimis use of force (*see* DSOF ¶ 78) that did not pose a substantial risk to serious harm as required under the objective component. Although Jefferson alleges that the technique was done to the point he started spitting up some blood (Doc. 1 at 2, 4; Doc. 24 at 11), this is a de minimis injury. Jefferson does not allege there was a large quantity of blood, and the mere presence of

blood does not change an otherwise de minimis use of force into excessive force. *See Calabria v. Dubois*, 23 F.3d 394 (table opinion), 1994 WL 209938, at *2 (1st Cir. May 24, 1994); *Davis v. Durant*, 66 F.3d 321 (table opinion), 1995 WL 535102, at *4 (5th Cir. Aug. 7, 1995). Because the objective element is not met, Jefferson's excessive force claim fails as a matter of law. Moreover, it was not clearly established that performing a trained pressure point tactic upon an inmate to gain compliance that resulted in some blood would satisfy the objective component. Therefore, qualified immunity applies, and the claim should be dismissed.

Alternatively, the uncontroverted evidence demonstrates that Defendants are entitled to summary judgment on the objective component. The evidence shows that Jefferson was non-compliant and struggling the entire time. (DSOF ¶¶ 9-10, 13, 20, 27-31, 37, 39-48, 56, 58, 60, 83, 90-91.) This Court addressed the video evidence provided in the *Martinez* report, and stated:

> The video shows that Plaintiff appeared to be in pain, and was agitated, yelling and foaming at the mouth. Plaintiff was also moving around and stiffening his body as they tried to secure him in the restraint chair. The video does not reflect that the officer choked Plaintiff until he became "semi-unconscious." Plaintiff continued to talk and yell while the officer applies pressure under his jaw until he was fully restrained in the chair.

(Doc. 13 at 7.) The District of Minnesota had a similar case in *Blevins v. Mollhoff*, No. 18-CV-0343, 2020 WL 1048944, at *8 (D. Minn. Jan. 30, 2020), and part of the court's analysis is applicable here:

> As to the claim that [the] use of pressure points "choked" Plaintiff, the video record depicts Plaintiff talking or yelling essentially continuously throughout the time that [officers] applied pressure points. . . . This flies in the face of Plaintiff's claim that he could not breathe, and certainly would not have conveyed to [an officer] that Plaintiff was in any acute distress or danger of choking. Similarly, although Plaintiff repeatedly yelled "Quit choking me!," there is no evidence on the video recording, or even from Plaintiff himself, that he became faint or short of breath.

Similarly, here, Jefferson was not choking. (*See* DSOF ¶¶ 20, 22-24, 61; Doc. 12.)

KDOC's Defensive Tactics Instructor Resource Manual describes the location, application, effects and uses of a hypoglossal-nerve pressure point. (Doc. 8 at 8 (describing Exhibit N); Doc. 8-13 (Exhibit N); *see also* DSOF ¶ 34.) It can be used as a "distraction tool, for pain compliance, or balance displacement." (Doc. 8-13; *see also* DSOF ¶ 34.) The video evidence attached to the *Martinez* report demonstrates that Defendant Merz used the hypoglossal-nerve pressure point for approximately 1 minute and 44 seconds while attempting to gain control over Jefferson to be placed in a restraint chair. (*See* DSOF ¶¶ 32, 49.) Defendant Merz ceased using the pressure point as soon as Jefferson was secured in the restraint chair. (DSOF ¶ 49.) And then he used it for another 15 seconds in the trauma room after Jefferson spat on another corrections officer. (DSOF ¶¶ 64-65.) Defendant Merz utilized the pressure point tactic in the proper location, for the proper effect and use that the tactic is intended for. Such location, application, effect and use were all within the bounds of KDOC's Defensive Tactic Instructor Resource Manual.

The video evidence shows Jefferson foaming at the mouth with only minimal blood mixed in approximately one minute into the hypoglossal-nerve pressure point performed by Defendant Merz. (DSOF ¶ 50.) Jefferson does not claim the foaming was due to Merz's actions. (DSOF ¶ 51.) It is also unclear what exactly caused the blood, and Jefferson has not alleged or produced a medical diagnosis or any other evidence that the minimal amount of blood was caused by Merz's actions aside from Jefferson's own conclusory allegations. Additionally, drugs or alcohol can alter a subject's resistance level and pain threshold in the subject's response to pressure-point techniques (DSOF ¶ 38), and Jefferson's behavior made it appear as though he might be under the influence (*see* DSOF ¶¶ 18, 20-26, 54, 56-57, 61, 70-71, 83).

Defendant Merz acted objectively reasonably under the circumstances, so the objective

component is not met. Alternatively, it was not clearly established that performing a trained pressure point tactic to gain control compliance over a resisting inmate would satisfy the objective component, so qualified immunity applies, and summary judgment should be granted to Defendants on this claim.

With regard to the subjective component, as indicated above, it is undisputed that Jefferson was non-compliant and several officers were attempting to gain control over him, making the relationship between the amount of force used and the need for such force subjectively reasonable. Even if Defendant Merz used the pressure point incorrectly in such a way that caused choking, it was not clearly established that imperfect application of a pressure point (*see* Doc. 25 at 7 ("SST Merz applied the hypoglossal to me . . . and done it incorrectly")) would satisfy the subjective component, and therefore qualified immunity applies, and this claim should be dismissed for failure to state a claim.

Alternatively, the uncontroverted evidence also demonstrates that Defendants are entitled to summary judgment on the subjective component. Merz's affidavit in the *Martinez* Report explained the need to use the pressure point on Jefferson:

> While officers were attempting to restrain Mr. Jefferson to the mobile restraint chair, my hands were in the area [of] Mr. Jefferson's neck.  Mr. Jefferson was struggling with officers who were attempting to secure him into the mobile restrain chair.  I was attempting to gain control of Mr. Jefferson using the hypoglossal nerve pressure point that I've been trained to use.  My training instructed that the hypoglossal nerve is located approximately one inch forward of the angle on the mandible and that one inch under the jaw is the most sensitive location of the nerve, where it enters the posterior part of the tongue.  I was trained to apply pressure toward the top and center of the skull with the thumb supported by the fist, or by using the two middle fingers unsupported.  I was trained to use the hypoglossal nerve pressure point as a distraction tool, for pain compliance or for balance displacement.

(Doc. 8-12 at ¶ 8; *see also* DSOF ¶¶ 32-35.) Merz (and Buchman) subjectively believed that the force Merz used was reasonable and necessary in the circumstances. (DSOF ¶¶ 75-79.) The

uncontroverted evidence shows that the need for the alleged force complained by Jefferson was reasonable under the circumstances and not done with malicious intent to cause harm as required by the subjective component of an excessive force claim. Further, the extent of the injury alleged by Jefferson is that he was choked until he began "spitting up blood." (Doc. 1 at 2, 4; Doc. 24 at 1, 11, 22; Doc. 25 at 1, 3, 9, 13) Yet, the video evidence shows Jefferson foaming at the mouth with minimal blood mixed in approximately one minute into the hypoglossal-nerve pressure point performed by Defendant Merz. (DSOF ¶ 50.) Jefferson does not claim the foaming was due to Merz's actions. (DSOF ¶ 51.) It is also unclear what exactly caused the blood. The extent of the injury was minimal, and any injury resulted despite Defendant's good-faith effort to maintain and restore discipline. Accordingly, the Defendants are entitled to summary judgment on this issue.

Alternatively, even if Defendant Merz used the pressure point incorrectly in such a way that caused choking (*see* Doc. 25 at 7 ("SST Merz applied the hypoglossal to me . . . and done it incorrectly")), it was not clearly established that imperfect application of a pressure point would satisfy the subjective component, and therefore qualified immunity applies, and summary judgment should be granted to Defendants on this claim.

b.  Femoral Nerve Pressure Point

Jefferson alleges that Defendant Buchman was an SST who "responded to medical condition 7-26-23 at 5:30pm he came in grabbed me in my throat while laying on the floor, kneed me in my side & legs while using force to place me in the chair." (Doc. 1 at 4; *see also* Doc. 1 at 3 ("choked me"); Doc. 24 at 3, 8, 17, 18, 22; Doc. 25 at 3, 7, 13.) Again, Jefferson acknowledges that his behavior during the time officers were placing him in a restraint chair was abnormal and could be looked at as non-compliant. (Doc. 24 at 7; Doc. 25 at 6-7.)

Jefferson alleges that Defendant Buchman used excessive force in violation of the Eighth

Amendment. (*See* Doc. 1 at 3 (referring to "choking" and "kneeing" as "excessive use of force").) Yet Jefferson does not allege that he suffered any injury from Defendant Buchman. Even if Jefferson may have felt pain from Buchman's alleged actions, conclusory claims of severe pain are not sufficient under the objective component. *See Hall,* 935 F.2d at 1110. And knee strikes are not considered excessive force in response to an inmate who is physically struggling against restraint by corrections officers. *See Winter v. Manfield*, No. 21-3171, 2022 WL 3652464, at *9 to *10 (10th Cir. Aug. 25, 2022). Therefore, Jefferson's allegations against Buchman fail to state a claim for which relief may be granted. Moreover, it was not clearly established that grabbing an inmate, performing knee strikes without causing injury, or using force to put an inmate in a restraint chair would satisfy the objective component. *See id.* Therefore, qualified immunity applies, and the claim should be dismissed.

Alternatively, the uncontroverted evidence shows that Defendant Buchman is entitled to summary judgment on the objective component. First, Defendant Buchman was not present while Jefferson was initially lying on the floor, and therefore no choking or grabbing of Jefferson's throat could have occurred as alleged. (DSOF ¶¶ 80-82; *see also* Doc. 1 at 3-4.) Second, at no point during the encounter with Jefferson on July 26, 2023, did Buchman choke Jefferson or otherwise restrain Jefferson's head, neck, or throat. (DSOF ¶¶ 95-96.) Third, as officers responded to Jefferson's medical outbreak, the evidence shows that Defendant Buchman assisted using the Femoral Nerve Pressure Point in order to gain further control compliance over Jefferson. (DSOF ¶¶ 83-91.) Pursuant to KDOC's Defensive Tactic Instructor Resource Manual, the Femoral Nerve is located down the inside of the thigh, approximately six inches above the knee joint. (Exhibit C at ¶¶ 11-12, pg. 6; *see also* DSOF ¶ 86.) The effect is temporary immobilization and motor dysfunction of the affected leg, which is used to assist takedown

control and distract under further restrained. (Exhibit C at ¶¶ 11-12, 6; DSOF ¶ 86.) The use of the femoral-nerve pressure-point technique was a de minimis use of force (*see* DSOF ¶ 78) that did not pose a substantial risk to serious harm as required under the objective component.

Given Jefferson's non-compliant behavior both based on his own admission and the video evidence, the pressure-point tactic used by Defendant Buchman was objectively reasonable. Defendant Buchman acted objectively reasonably under the circumstances, so the objective component is not met. Alternatively, it was not clearly established that performing a trained pressure point tactic to gain control compliance over a resisting inmate would satisfy the objective component, so qualified immunity applies, and summary judgment should be granted to Defendants on this claim.

Regarding the subjective component, Defendant Buchman used the pressure point: "[t]o assist the other officers in controlling and restraining Jefferson, who was still actively struggling." (Exhibit C at ¶ 15; *see also* DSOF ¶ 89.) The knee strikes resulted in temporary immobilization, motor dysfunction, and mental stunning, as intended. (DSOF ¶ 90.) They caused Jefferson's muscles to briefly relax and for his struggle to briefly pause. (DSOF ¶ 90.) This enabled officers to finish strapping Jefferson into the restraint chair more easily. (DSOF ¶ 91.) Buchman subjectively believed the force he used was reasonable and necessary. (DSOF ¶ 97.)

Buchman's actions were not done maliciously or done with the intent to cause harm, but to assist other officers in gaining compliance over Jefferson. The relationship between the need to gain control over Jefferson and the amount of force used by Defendant Buchman further satisfies the subjective component. Additionally, Jefferson alleged no injury from the compliance tactic. Based on the evidence, summary judgment should be granted in favor of the Defendants.

Alternatively, it was not clearly established that performing a trained pressure point tactic

without malice or an intent to cause harm to an inmate, but rather to gain control compliance, would satisfy the subjective component. Therefore, qualified immunity applies, and summary judgment should be granted to Defendants on this claim.

## V.    Defendants were not deliberately indifferent to any serious medical needs related to the handcuffs.

Under the Eighth Amendment, a claim can be brought under the deliberate-indifference or excessive-force frameworks. An excessive-force claim involves prison officials either: (1) employing force to resolve a prison disturbance, *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)); (2) using a type of force (such as pepper spray) that inherently involves "prison officers wield[ing] their authority, or force," *Toney v. Harrod*, 372 F. Supp. 3d 1156, 1163 (D. Kan. 2019) (quoting *Norton v. City of Marietta*, 432 F.3d 1145, 1154 (10th Cir. 2005)); or (3) simply "stand[ing] accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause," *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). An Eighth-Amendment claim for placing or leaving handcuffs on too tightly does not generally fall into these categories, so it is handled under a theory of deliberate-indifference to serious medical needs. *See Baskin v. Thomas*, No. 23-3212-JAR, 2024 WL 4948882, at *6 (D. Kan. Dec. 3, 2024); *Grissom v. Bell*, No. 20-3163-JWB, 2022 WL 4534620, at *5 (D. Kan. Sep. 28, 2022).

As part of the Eighth Amendment's prohibition on cruel and unusual punishments, a prison official may not act with "deliberate indifference to inmate health or safety." *Penrod v. Zavaras*, 94 F.3d 1399, 1405-06 (10th Cir. 1996). Deliberate indifference has both an objective component and a subjective component. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For the objective component, liability for deliberate indifference requires the plaintiff to show "he is incarcerated under conditions posing a substantial risk of serious harm." *Verdecia v.*

*Adams,* 327 F.3d 1171, 1175 (10th Cir. 2003). For "serious medical needs" claims specifically, the plaintiff must show that the prisoner's medical need was "sufficiently serious." *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (citing *Farmer*, 511 U.S. at 834). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* Alternatively, the objective prong is met if a delay in medical care causes a sufficiently serious "resulting harm." *Teetz ex rel. Estate of Lofton v. Sedgwick Cnty.*, 2022 WL 17403164, at *8 (D. Kan. 2022) (citing *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022)).

The *subjective* component requires showing that the prison official had "a sufficiently culpable state of mind." *Beauford*, 35 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 834). The plaintiff "must adduce sufficient facts to show the defendant knew of and disregarded 'an excessive risk to inmate health or safety.'" *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1173 (10th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Even if both the objective and subjective prongs are met, "a constitutionally legitimate justification" may still be shown. *Arocho v. Nafziger*, 367 F. App'x 942, 952 (10th Cir. 2010). This should be determined, not with the benefit of hindsight, but based on what the official reasonably knew at the time. *See Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (saying in the context of the deliberate-indifference standard that "courts do not judge the constitutionality of particular actions 'with the 20/20 vision of hindsight'"). Prison officials have a "legitimate penological interest of

maintaining control and discipline in the prison facility." *Evans v. Cawthorn*, No. 16-3095-DDC, 2019 WL 5787952, at *8 (D. Kan. Nov. 6, 2019).

Regarding claims of tight handcuffs specifically, "a failure to loosen handcuffs or to use regular-sized handcuffs on an inmate who may need large-sized handcuffs does not violate the Eighth Amendment." *Grissom v. Bell*, 2022 WL 4534620, at *8 (citing *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *7 (10th Cir. Aug. 19, 2022)). And effects from tight handcuffs like discomfort, bruising, and blisters are insufficient to meet the objective component of a deliberate indifference claim without a medical diagnosis mandating treatment, a symptom that would make it obvious that the plaintiff required medical attention (such as severe chest pain, being pale, sweating, vomiting, or "contusions and cuts to the head and neck"), or substantial harm (such as "lifelong handicap, permanent loss, or considerable pain"). *Baskin*, 2024 WL 4948882, at *7.

Here, Jefferson never alleges that Defendants applied the handcuffs to him. Jefferson does allege that the handcuffs placed on him were too tight, which resulted in his hands and fingers tingling and becoming numb due to lack of circulation. (Doc. 24 at 4, 12, 18-19; Doc. 25 at 4, 5, 10, 12.) Jefferson further alleges that this resulted in scarring. (Doc. 24 at 18; Doc. 25 at 10, 12.) But nothing in Jefferson's pleadings indicate a medical diagnosis mandating treatment for his wrists, any symptoms that would make it obvious that he required medical attention for his wrists, or a substantial harm due to the handcuffs. (*See* Doc. 1; Doc. 24; Doc. 25.) So Jefferson has not satisfied the objective component of a deliberate-indifference claim for tight handcuffs, so the claim should be dismissed for failure to state a claim. Alternatively, it was not clearly established that leaving handcuffs on an inmate in a restraint chair was a constitutional violation, and therefore qualified immunity applies, and the claim should be dismissed.

Alternatively, the uncontroverted evidence supports summary judgment on this claim. The uncontroverted evidence reflects only minimal abrasions and scratches around the wrist area where the handcuffs were placed. (DSOF ¶ 15.) Such evidence does not satisfy the objective component of an excessive force claim and is therefore insufficient to defeat Defendants' alternative motion for summary judgment. And Defendants did not make the inference that Jefferson had a medical need with regard to his wrists, so the subjective component was not met. (*See* DSOF ¶ 18.) Further, Defendants had a constitutionally legitimate justification to restrain a struggling prisoner for transport. *See Williams v. Gray*, No. CIV-19-820-HE, 2019 WL 8108361, at *8 (W.D. Okla. Oct. 9, 2019). And, again, it was also not clearly established that leaving handcuffs on an inmate in a restraint chair was a constitutional violation, and therefore qualified immunity applies, and summary judgment should be granted to Defendants on this claim.

## VI.    Jefferson fails to state a claim for Eight-Amendment deliberate indifference due to failure to intervene because there was no underlying constitutional violation to intervene in.

Deliberate indifference can also be brought under a failure-to-intervene theory. *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015). "In order to be liable for failure to intervene, the officers must have observed or had reason to know of a constitutional violation and have had a realistic opportunity to intervene." *Id.* For a failure-to-intervene claim to succeed, "there must exist an underlying constitutional violation." *Winter v. Mansfield,* No. 21-3171, 2022 WL 3652464, at *11 (10th Cir. Aug. 25, 2022) (quoting *Jones*, 809 F.3d at 576); *see also id.* at *11 ("Because there was no underlying constitutional violation, the district court correctly rejected Mr. Winter's failure-to-intervene claim.").

Here, Jefferson's brings deliberate-indifference claims based on a failure-to-intervene theory. Specifically, Jefferson alleges that Defendants were present during the July 26, 2023,

incident and acted with deliberate indifference, a violation of his Eighth-Amendment rights, when they failed to intervene to stop the alleged abuses against him. (Doc. 1 at 6-7.) But there was no underlying constitutional violation because, as discussed above, there was no underlying violation of excessive force or deliberate indifference to medical needs. Therefore, intervention was not required. Accordingly, if the Court dismisses the other Eighth-Amendment claims under Rule 12, then the failure-to-intervene claims also fail to state a claim upon which relief may be granted. Alternatively, if the Court grants Defendants summary judgment on the other Eighth-Amendment claims, then Defendants are also entitled to summary judgment on the failure-to-intervene claims.

## CONCLUSION

For these reasons, Defendants request that the Court dismiss the claims against them for lack of subject-matter jurisdiction and failure to state a claim or, alternatively, grant them summary judgment on the claims against them.

<div style="margin-left: 40%">

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of January, 2025, the foregoing document was filed with the clerk of the court by using the CM/ECF system, with a copy to be served by means of first-class mail, postage prepaid, addressed to:

Anthony Jefferson #44578
Lansing Correctional Facility
P.O. Box 2
Lansing, KS 66043
*Plaintiff, pro se*

I also certify that a copy will be delivered to him personally by his unit team.

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General